IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MORRIS W. DIGMAN,

    Plaintiff,                                    CIV. S. 05-1190 GGH

    vs.

JO ANNE B. BARNHART,                 <u>ORDER</u>
Commissioner of Social Security,

    Defendant.
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). For the reasons that follow, plaintiff's Motion for Summary Judgment is denied**,** and the Commissioner's Motion for Summary Judgment is granted. The Clerk is directed to enter judgment for the Commissioner.

<u>BACKGROUND</u>

        Plaintiff, born May 10, 1957, applied for disability benefits on February 21, 2002. (Tr. at 53.) Plaintiff alleged he was unable to work due to arthritis, pain in the back, hips, shoulder, arm and hand, heart problem, low back pain, depression, and borderline intellectual functioning. (Tr. at 62, 24, 16.) In a decision dated December 22, 2003, ALJ Antonio Acevedo-

\\\\\

Torres determined that plaintiff was not disabled.[1]  He found that plaintiff could not do his past work as construction floor worker but could do a substantial range of unskilled medium work as reduced by a mental impairment.  (Tr. at 26.)  The Appeals Council granted plaintiff's request for review, and remanded for further evaluation of plaintiff's mental impairment, further consideration of plaintiff's residual functional capacity, and to obtain vocational testimony.  (Tr. at 321.)  ALJ Torres held another hearing on February 7, 2005, and issued a second decision on February 17, 2005, finding that plaintiff was not disabled.  The ALJ made the following findings:

>    1.   The claimant has not engaged in substantial gainful activity since February 21, 2002.
>
>    2.   The medical evidence establishes that the claimant has severe musculoskeletal pain, depression, substance abuse disorders and borderline intellectual functioning, but that he does not have an impairment or combination of

---

[1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

>    Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
>    Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
>    Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
>    Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
>    Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

|   |   |   |
|---|---|---|
| | | impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. |
| | 3. | The claimant's testimony is not substantially credible for the reasons stated in the body of this decision. |
| | 4. | The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for frequently lifting more than 25 pounds and occasionally lifting more than 50 pounds. He is also limited to simple, routine unskilled work. (20 CFR 416.945). |
| | 5. | The claimant is unable to perform his past relevant work. |
| | 6. | The claimant's residual functional capacity for the full range of medium work is reduced by a mental impairment related to non-exertional limitation. |
| | 7. | The claimant is presently 46 years old, which is defined as a younger age individual (20 CFR 416.963). |
| | 8. | The claimant possesses a 9th grade education (20 CFR 416.964). |
| | 9. | The claimant has not acquired work skills, which are transferable to the skilled or semiskilled work functions of other work (20 CFR 416.968). [Sic] |
| | 10. | Based on an exertional capacity for a medium range of work eroded by a limitation to simple, routine unskilled work tasks, and the claimant's age, education, and work experience, sections 416.969 and Rule 203.26 of Table No. 3, Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of "not disabled" within the framework of this rule. |
| | 11. | The claimant's capacity for medium work has been compromised by his nonexertional limitation to understanding and carrying out simple, routine unskilled work tasks. In that regard, the vocational expert testified that an individual with that residual functional capacity could perform the following occupations which exist in significant numbers: (1) Packing Line Worker – a light occupation with an SVP of 2 (190,000 jobs in the U.S. and 20,000 jobs in the state); (2) Small Parts Assembler – a light occupation with an SVP of 2 (700,000 jobs in the U.S. and 68,000 jobs in the state); (3) Can Filler at Manufacturing Plant – light occupation with an SVP of 2 (153,000 jobs in the U.S. and 18,000 jobs in the state); (4) Assembler – sedentary occupation with an SVP of 2 |

(152,000 jobs in the U.S. and 14,000 in the state); (5) Non-Construction Laborer – a sedentary occupation with an SVP of 1 (67,000 jobs in the U.S. and 6,000 jobs in the state); (6) Production Checker – a sedentary occupation with an SVP of 2 (37,000 jobs in the U.S. and 3,500 jobs in the state). The Vocational Expert also identified jobs that claimant could perform at the medium exertional level, such as janitor with a volume of over 2 million jobs in the U.S. and over 33,000 jobs in the State. Accordingly, using the above cited rule as a framework for decision making and crediting the vocational expert's testimony, the claimant is not disabled.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920(f)).

(Tr. at 16-17.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Failed to Consider All of Plaintiff's Impairments at Step Two of the Analysis; B. Whether the ALJ Erred in Failing to Find That Plaintiff's Borderline Intellectual Functioning Satisfied Listing 12.05C; C. Whether the ALJ Failed to Provide Legitimate Reasons for Rejecting Dr. Wolf's Opinion; D. Whether the ALJ Rejected Plaintiff's Testimony and Credible Third Party Evidence Without Providing Legally Sufficient Reasons; and E. Whether the ALJ Failed to Include All of Plaintiff's Limitations in the Hypothetical to the Vocational Expert.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical

4

testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

A. Whether the ALJ Failed to Consider All of Plaintiff's Impairments at Step Two of the Analysis

Plaintiff first claims that the ALJ erroneously excluded from consideration at step two plaintiff's carpal tunnel syndrome ("cts"), degenerative joint disease in the hands, recurrent upper extremity cellulitis, and bronchitis.

At the second step of the disability analysis, an impairment is not severe only if it "would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered." SSR 85-28. The purpose of step two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987). "The step-two inquiry is a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). At this step, the ALJ may decline to find a severe impairment "*only* if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005) (emphasis in original). Nor does the allegation of symptoms alone, whether credible or not, suffice to establish a severe impairment:

> To qualify for benefits, Ukolov must be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1). The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added); see

5

also 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D) (emphasis added).

In Social Security Ruling (SSR) 96-4p, the SSA explained what is needed under SSA regulations to show a medically determinable impairment. SSR 96- 4p, 1996 WL 374187 (July 2, 1996). [FN2 omitted] The ruling clarified that "[a]lthough the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone." Id. at *1 (footnote omitted); see also 20 C.F.R. §§ 404.1508, 416.908. The ruling noted the distinction between symptoms and signs: "symptoms ... are an individual's own perception or description of the impact of his or her physical or mental impairment(s) .... [W]hen any of these manifestations is an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical 'sign' rather than a 'symptom.'" SSR 96-4p, 1996 WL 374187, at *1 n. 2; see also 20 C.F.R. §§ 404.1528(a)-(b), 416.928(a)-(b). The ruling then reemphasized the importance of objective medical evidence to a determination of disability:

> [R]egardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings .... In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process.

SSR 96-4p, 1996 WL 374187, at *1-2.

Under these standards, Ukolov can only establish an impairment if the record includes signs--the results of "medically acceptable clinical diagnostic techniques," such as tests--as well as symptoms, i.e., Ukolov's representations regarding his impairment.

Ukolov v. Barnhart, 420 F.3d 1002, 1004-1005 (9th Cir. 2005).

\\\\\

6

The ALJ in this case found that plaintiff has musculoskeletal pain, depression, substance abuse disorders and borderline intellectual functioning. (Tr. at 16.) He did not find plaintiff's "hand degenerative joint disease" as diagnosed by Dr. Wolf to be a severe impairment. (Tr. at 181.) Nor did he find plaintiff's claim of carpal tunnel syndrome (for which a Phalen's test was done and wrist splints prescribed), which was diagnosed in one treatment note, dated August 14, 2003, to be severe. (Tr. at 333-35.) These diagnoses, which are more properly classified as conditions, were made only one time in the record. There is no indication that they were expected to last as long as twelve months. Dr. Wolf did not give an opinion regarding the severity of the degenerative joint disease, or its long term effects. He stated with respect to plaintiff's functional ability that manipulative limitations were only mild to minimal. (Tr. at 181.) Under Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001), even if plaintiff can demonstrate a medically determinable impairment, he must also prove that this impairment affects his ability to perform basic work activities. Id. at 1159-60. There is no evidence in the record indicating that this impairment has an effect on plaintiff's ability to do basic work activities, and therefore it is not severe. Furthermore, the ALJ correctly explained that the diagnosis of degenerative joint disease of the hand was not corroborated by radiological imaging studies. (Tr. at 14.) Additionally, Dr. Wolf's opinion was further discounted for other reasons. See discussion *infra*.

In regard to the one time diagnosis of carpal tunnel syndrome, it was only diagnosed near the end of the treatment record, in August, 2003, only a few months before the first administrative hearing, and was not raised initially as a basis for disability. Its severity was not described in the notes which were very cursory, and there was absolutely no analysis of its effect on plaintiff's ability to do basic work activities, or its long term prognosis. In order to qualify as a severe impairment, a condition must be expected to last over the long term.

In regard to claims of cellulitis and bronchitis, there is no evidence that these are more than transient conditions which were resolved. Cellulitis was diagnosed on March 31,

1  2001, and June 18, 2002.  (Tr. at 132, 193.)  On both occasions, plaintiff was discharged from the

2  hospital after a few days.  (Id. at 132, 190.)  Plaintiff had only one incident of bronchitis, on

3  January 5, 2001.  (Id. at 152.)  There is no other record of it.  There is no support for plaintiff's

4  apparent idea that these diagnoses are simply additive, permanent, and never changing.  These

5  conditions show no likelihood of recurrence and are therefore not severe impairments.

6       B.  Whether the ALJ Erred in Failing to Find That Plaintiff's Borderline Intellectual

7  Functioning Satisfied Listing 12.05C

8       Plaintiff contends that he meets Listing 12.05C.  The ALJ determined in finding

9  no. 2 of the decision that plaintiff's impairments did not meet or equal an impairment listed in

10 the Regulations' "Listing of Impairments" ("Listings"), which lists impairments to thirteen

11 categories of body systems which are severe enough to preclude any gainful activity.  Young v.

12 Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. § 404.1520(d).  When all the

13 requirements of a listing are met, the described condition is irrebuttably presumed disabling.

14 Key v. Heckler, 754 F.2d 1545, 1550 (9th Cir. 1985); 20 C.F.R. § 404.1520(d).

15      At the third step of the disability analysis, the ALJ determines whether a person's

16 condition either "meets" or "equals" a listing.  A mere *diagnosis* of a listed impairment is not

17 sufficient.  Specific findings included in each listing also must be met.  See, e.g., Key v. Heckler,

18 754 F.2d 1545, 1550 (9th Cir. 1985).  Alternatively, other diagnostic tests, or the combined

19 effects of various conditions, may demonstrate the "equivalent" of the specific required findings.

20 See, e.g., Sullivan v. Zebley, 493 U.S. 521, 531 (1990); Marcia v. Sullivan, 900 F.2d 172 (1990).

21 In sum, however, unless an impairment is as severe as and has lasted as long as described in the

22 listing, a person is not presumptively disabled.  Young, 911 F.2d at 183.

23      Listing 12.05 provides in part:

24      Mental retardation refers to significantly subaverage general
        intellectual functioning with deficits in adaptive functioning
25      initially manifested during the developmental period; i.e., the
        evidence demonstrates or supports onset of the impairment before
26      age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, **or** D are satisfied.
>
> ...
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function;
>
> ...

20 CFR § 12.05 (emphasis added).

"An impairment imposes a significant work-related limitation of function when its effect on a claimant's ability to perform basic work activities is more than slight or minimal." Fanning v. Bowen, 827 F.2d 631, 633 (9th Cir. 1987).  This, in other words, is the definition of a "severe" impairment.  Thus, in this circuit, a person who has a severe physical or other mental impairment, as defined at step two of the disability analysis, apart from the decreased intellectual function, meets the second prong of the § 12.05C listing.  Id.; see also Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997); Edwards v. Heckler, 736 F.2d 625, 629-31 (11th Cir.1984); Nieves v. Secretary of Health & Human Servs., 775 F.2d 12, 14 & n. 7 (1st Cir.1985)).  Indeed, in footnote 3 of the Fanning decision, the court found that the "extra" impairment need not even reach the "severe" limit; although one might be hard pressed to call a less than "severe" impairment an impairment at all.

In Fanning, the first prong of the listing was met because plaintiff's IQ was found to be between 76 and 69.  Fanning, 827 F.2d at 633.  The court imposed a standard applicable to the second prong, that the impairment must have more than a slight or minimal effect on plaintiff's ability to perform basic work activities.  Id.  Because the ALJ had not considered this question in regard to the plaintiff's knee injury, the court remanded the matter.  Id.

In the instant case, the ALJ found plaintiff to have borderline intellectual functioning; however, he refused to find that this limitation existed prior to age 22.  (Tr. at 16, 13.)   The only evidence to support plaintiff's claim that he suffered from borderline intellectual functioning prior to age 22 is his own testimony and statements to medical professionals.  Plaintiff testified that he dropped out of school in 8th or 9th grade, and had trouble reading and

9

counting change. (Tr. at 366, 369-70.) Although lay evidence may be permissible, the date alleged by the plaintiff should be used only when consistent with other available evidence. Social Security Ruling 83-20. "The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record." (Id.) The fact that plaintiff may have dropped out of school does not automatically lead to the conclusion that it was due to borderline intellectual functioning. Furthermore, reliance solely on a claimant's statements without corroboration creates the potential for abuse, especially in this case where the ALJ found plaintiff to be not substantially credible. See discussion *infra*. Plaintiff has submitted no other evidence of his onset date, such as school records or even school psychologist's reports, let alone medical records, and therefore has not met his burden. Without evidence of onset prior to age 22, listing 12.05 can not be satisfied.

C.   Whether the ALJ Failed to Provide Legitimate Reasons for Rejecting Dr. Wolf's Opinion

Plaintiff contends that the ALJ did not give specific or legitimate reasons to reject Dr. Wolf's opinion in favor Dr. Leung's report.

> The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.1990); Gallant v. Heckler, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician.

Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).

Here, the ALJ gave eight enumerated reasons for dismissing Dr. Wolf's report and the lifting restrictions of lifting ten pounds and occasionally 20 pounds imposed by Dr. Wolf as a result of it:

> (1) The doctor's cardiac testing was negative. (2) The doctor did not conclusively diagnose cardiac disease. (3) The doctor's assessment is at odds with a normal ECG test in January 2001 and normal chest X rays in March 2001 and June 2002. (4) The doctor appeared to have based his finding upon the claimant's self-serving

> subjective statements.  (5) The doctor's lifting findings are at odds with that of other more credible consultative medical assessments.  (6) The doctor's diagnosis of degenerative hand joint disease was not corroborated by radiological imaging studies.  (7) The doctor's lifting restrictions are inconsistent with the claimant's wide ranging daily living activities.  (8) The claimant has not required medical care for cardiac disease.

(Tr. at 14.)

Dr. Wolf, an internist, examined plaintiff on May 25, 2002, without the benefit of any medical records.  (Tr. at 178.)  He noted swelling and deformity in the joints of the thumbs and hands bilaterally, and some fingers of the right hand.  (Id. at 180.)  There was mild thumb joint tenderness.  Plaintiff could manipulate his hand fairly well, buttoning his shirt and signing his name without assistance.  It was noted that there was decreased grip strength bilaterally with an incomplete effort, possibly due to hand arthritis.  (Id.)  Dr. Wolf limited plaintiff to standing and walking for six hours in a work day and sitting for six hours.  Plaintiff could lift 20 pounds occasionally.  Dr. Wolf noted that it would be helpful to have records of previous diagnostic tests of coronary symptoms as well as hospitalizations for previous meningitis.  (Id. at 181.)  This physician concluded that plaintiff had possible coronary artery disease and recurrent angina pectoris, hand degenerative joint disease, history of cigarette and drug use, and history of possible recurrent meningitis.  (Id.)

Dr. Wolf based these diagnoses on plaintiff's subjective reporting of "mild heart attacks," based on chest pains, for which he claims he was hospitalized for several days six months earlier.  Unfortunately, there are no records reflecting this hospitalization in the record submitted, and Dr. Wolf's own exam indicated a regular heart rate.  (Tr. at 179.)  A radiology report, dated January, 2001 was normal in regard to the heart, although the lungs were slightly hyperinflated.  (Id. at 177.)  Two additional reports, both from March, 2001, were normal, as was a chest x-ray in June, 2002.  (Tr. at 162, 168, 200, 219.)  An undated chart note states that it was unclear if plaintiff had coronary artery disease ("CAD") because there were no admissions at UCD Medical Center with this type of complaint.  (Tr. at 142.)  Plaintiff was found to be at low

risk for cardiac related complications or problems.  (Id.)  Another note stated, "? CAD, no documentation." (Tr. at 140.)

        Furthermore, as noted in the discussion *supra* which addressed plaintiff's degenerative joint disease of the hand at the step two phase of the analysis, Dr. Wolf was the only source for this diagnosis.  The remainder of the medical record submitted in this case does not contain any diagnosis of this sort other than one diagnosis of carpal tunnel syndrome on February 20, 2004.  (Tr. at 333.)  In fact, x-rays of the left forearm and left hand in March, 2001, indicated no osteomyelitis and only mild soft tissue swelling.  (Id. at 163-64.)  There is also only one mention in the record of cardiac problems; however, plaintiff was the only source for his reported chest pain which may have been related to his diagnosis of bronchitis.  (Tr. at 151-52.)  In any event, this complaint was not pursued by treating sources beyond the chest x-ray which showed only bronchitis.  (Id.)  The record indicates absolutely no medical evidence of coronary artery disease or recurrent angina pectoris, as suggested by Dr. Wolf.

        Instead, the ALJ relied on the opinion of Dr. Leung, who found no physical limitations whatsoever.  This senior resident in neurology examined plaintiff on November 24, 2002, after reviewing a CT scan of the head showing left frontal soft tissue swelling, and a chart note.  (Id. at 244.)  Plaintiff's chief complaints at this time were low back pain and headaches.  Range of motion of the joints in the upper body were normal, except that flexion/extension of the proximal phalanx was 70 degrees and distal phalanx 90 degrees bilaterally.  There was full bilateral motor strength and muscle bulk and tone were 5/5 symmetrically.  (Id. at 246.)  Plaintiff was diagnosed with low back pain, and demonstrated difficulty in getting on and off the examination table.  (Id. at 247.)  Dr. Leung also diagnosed chronic daily headaches which could be migraines or tensions headaches.  Dr. Leung concluded that plaintiff had no functional limitations.

        It is true that two SSA consultants reviewed the record and found plaintiff capable of light work, in agreement with Dr. Wolf's conclusion.  One physician noted that his light work

1  finding differed from another opinion but explained that the conclusion of medium work was not
2  supported by the evidence on file due to "antalgic gait and migraines," referring to Dr. Leung's
3  conclusions. (Tr. at 273.)  In fact, Dr. Leung did not conclude that plaintiff had migraines but
4  that his headaches had features of tension headaches and migraines and "are usually associated
5  with migraine headaches." (Id. at 247.)  Dr. Leung did note an antalgic gait, but stated only that
6  plaintiff walked slowly. (Id. at 245.)  There is no evidence that plaintiff was actually treated for
7  either of these problems.

8     The other SSA consultant based his finding of light work on "degenerative
9  arthritis affecting his hands and probable angina."  This reviewing doctor also noted that the
10 medical record did not support the presence of coronary artery disease. (Tr. at 304.)  This report
11 also reflected the report of swelling in both thumbs and the second and third fingers of the right
12 hand, as well as decreased range of motion of the hip. (Id. at 305.)  The only medical record
13 upon which these findings could have been based is the report of Dr. Wolf.  Therefore, although
14 it may superficially appear that more medical practitioners opined that plaintiff could do only
15 light work, the source for the additional opinions is just one consulting physician, Dr. Wolf.
16 Furthermore, these SSA consulting physicians did not examine plaintiff, but only reviewed the
17 file.  As a result, the bulk of the record supports Dr. Leung's conclusion that there are no lifting
18 restrictions, allowing plaintiff to do medium work.  The ALJ gave multiple sufficient reasons
19 supported by the record to reject Dr. Wolf's opinion in favor of Dr. Leung.

20  D.  Whether the ALJ Rejected Plaintiff's Testimony Without Providing Legally Sufficient
21 Reasons

22    Plaintiff asserts that the ALJ did not provide legitimate reasons for failing to
23 credit plaintiff's testimony.

24    The ALJ determines whether a disability applicant is credible, and the court defers
25 to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater,
26 94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Id. at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[2] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

---

[2] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

Here, the ALJ found, *as one factor*, plaintiff to be not substantially credible because his complaints were not proportional to the weight of the objective evidence. The ALJ noted,

> the record shows that notwithstanding the claimant's musculoskeletal pain complaints, there is no medical evidence of significant degenerative spinal pathology, degenerative changes or soft tissue injury, surgery has not been recommended, conservative medical care has been successful in controlling his pain, objective clinical findings are unremarkable, he is able to move about without much difficulty, ambulation does not require assistive devices and he lives a fairly active and functional lifestyle.

The ALJ cited to Dr. Leung's report insofar as plaintiff's subjective reporting was not consistent with the physcan exam, and referred to radiological studies elsewhere in the record. (Tr. at 13-14.) The ALJ also discussed plaintiff's daily activities: cooking, yard work, household cleaning, vacuuming, mopping, washing dishes, socializing, and personal appearance. (Id. at 14.)

A review of the file indicates that in addition to the aforementioned factors, there is a real dearth of treatment records. Plaintiff did not appear to have a treating physician, but went to the emergency room for specific problems which did not seem to reoccur. Plaintiff alludes to recurrent cellulitis; however, there are only two occasions of cellulitis in the record, with the most recent one being on June 18, 2002. (Tr. at 132, 193.) Plaintiff additionally refers to the other medical diagnoses which support plaintiff's symptoms and limitations; nevertheless, these conditions were listed only once or twice in the record. It does not appear that they were expected to last twelve months, and in any case, plaintiff did not seek regular treatment for them. For example, carpal tunnel syndrome was diagnosed only one time in the record. (Tr. at 333-35.) Plaintiff was treated for bronchitis only one time. (Id. at 152.) Headaches were only diagnosed in Dr. Leung's report. (Id. at 244-47.) There is no record that plaintiff received treatment for this problem. Additionally, degenerative joint disease in the hand was diagnosed only by Dr. Wolf, and his report has been discounted. Although the record reflects degenerative changes of the

15

lower lumbar spine, they were mild in nature, and there is no evidence that plaintiff obtained treatment in this regard. (Id. at 168.)  A similar study of the left shoulder was negative. (Id. at 165.)  Plaintiff points to his testimony that he was not wearing his braces on the day of the hearing; however, there is no evidence that braces were issued to him.

Plaintiff also raises emphysema for the first time in this section; however, the only record of this condition is plaintiff's own testimony that he uses an inhaler twice a day, and that extreme weather exacerbates his symptoms.  There is no evidence that plaintiff underwent any tests such as a spirometry test, or obtained an inhaler or other medication or treatment.  Chest x-rays and physical exam did not reveal this condition. (Id. at 162, 168, 179, 245.)  In fact lungs and lung volume were clear on objective studies, and even during Dr. Wolf's exam, and this condition was never diagnosed. (Id.)

In regard to his mental impairment, the ALJ relied on both Dr. Nakagawa's and Joyce's opinions that plaintiff could work doing simple tasks as long as he remained sober. (Id. at 185, 252.)  Both Nakagawa, a psychologist, and Joyce, a psychiatrist, diagnosed plaintiff with current alcohol abuse, and substance abuse in remission. (Id.)  The ALJ did address plaintiff's alcohol abuse, stating that although plaintiff had a history of such abuse, he has been clean and sober for three months, following completion of a rehabilitation treatment program. (Id. at 13.)  He also questioned plaintiff extensively about his alcohol and drug use at the hearing. (Tr. at 345-46.)  Plaintiff also testified that he has not used cocaine in about two months, and had completed a drug and alcohol rehabilitation program. (Id., 370-72.)

It is interesting to note that at both hearings, on November 5, 2003, and February 7, 2005, plaintiff testified that he had stopped using drugs and alcohol about two to three months earlier, and at the second hearing, he testified that he only drinks now once a week.  He also testified that he only does cocaine "once in a while now," but in the next breath stated that he

\\\\\

\\\\\

quit using it a couple of months ago. (Tr. at 346, 371, 372.) This inconsistency reflects poorly on plaintiff's credibility.[3]

The record on plaintiff's daily activities is somewhat inconsistent. Plaintiff testified that his girlfriend did all the housework, and he spends most of the day watching television or playing with his dog. (Tr. at 351.) Plaintiff and his sister completed some daily activities questionnaires in which they both stated that he does nothing but watch television and lay around, sleeping on and off all day, or sitting outside. (Tr. at 75, 81.) Plaintiff apparently reported to Dr. Leung, however, that he is able to cook and do yard work, housework, vacuuming, mopping, and dishes. (Tr. at 245.) Plaintiff also related that he "clean[s] up and help[s] paint rooms when needed" in return for free rent. (Tr. 54). He also "sometimes help[s] the maids and clean[s] up in the parking lot." Id. Plaintiff testified at the first hearing that he cooks sometimes, but his girlfriend who lives with him, does all the housework. (Id. at 350, 351.) The ALJ was entitled to rely on plaintiff's statements to Dr. Leung in this regard.

E. Whether the ALJ Failed to Include All of Plaintiff's Limitations in the Hypothetical to the Vocational Expert

Plaintiff finally contends that the hypothetical to the expert did not include his manipulative and postural limitations, a need to lie down, need for naps, and the effect of his borderline intellectual capacity on his ability to learn new skills.

Hypothetical questions posed to a vocational expert must include all the substantial, supported physical and mental functional limitations of the particular claimant.

---

[3] The court has doubts that plaintiff has recovered for a sufficient time such that his mental problems as alleged are not caused or contributed to by drug/alcohol abuse. However, plaintiff, of course, does not raise the issue as to do so may well preclude benefits on a per se basis. The ALJ may have taken the easy analytical way out by finding (hoping) that plaintiff had indeed recovered from his drug and alcohol abuse such that the abuse would drop out of the analysis altogether. See Bustamante v. Massanari, 262 F.3d 949 (9th Cir. 2001). If plaintiff exhibits poor mental acuity at present, but see (Tr. 251-252), perhaps it had not much to do with native intelligence and much to do with years of brain diminishing drug and alcohol abuse. Nevertheless, no one raises the drug/alcohol issue, and the court will not raise it sua aponte.

Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d 789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the expert's testimony as to available jobs in the national economy has no evidentiary value. DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d 947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions, based on alternate interpretations of the evidence, substantial evidence must support the hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).[4]

      The vocational expert was asked to identify all unskilled jobs, dealing with things rather than with people, that plaintiff could do at all exertional levels.  (Tr. at 382.)  The expert identified several jobs at all levels, including medium, light and sedentary.  (Id. at 382-83.)  This question, therefore, did include plaintiff's suggested nonexertional limitation of borderline intellectual capacity because it limited the work universe to unskilled jobs.  Manipulative and postural limitations were appropriately not included in the hypothetical, because as described in the discussion at step two, they were properly found to be not severe.  Plaintiff refers to his "Summary of Relevant Medical Evidence" in regard to his need to lie down and take naps; however, no physician has ever so limited plaintiff.

      Therefore, substantial evidence supports the ALJ's hypothetical to the expert.

\\\\\

\\\\\

---

[4] Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial evidence or reject them if they are not.  Id. at 756-757.

CONCLUSION

The court finds the ALJ's assessment is supported by substantial evidence in the record and based on the proper legal standards. Accordingly, plaintiff's Motion for Summary Judgment is DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the Clerk is directed to enter Judgment for the Commissioner.

DATED: 9/11/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Digman1190.ss.wpd